UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

IN RE YUM! BRANDS, INC.                     CIVIL ACTION NO. 3:13-CV-00463-CRS
SECURITIES LITIGATION

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on the Motion to Dismiss (DN 82) of Defendants Yum!

Brands, Inc. ("Yum!" or the "Company"), David C. Novak, Richard T. Carucci, and Jing-Shyh

S. Su ("Individual Defendants").  Defendants request that the Court dismiss the Consolidated

Class Action Complaint ("Complaint") (DN 72) with prejudice for failure to state a claim under

Federal Rule of Civil Procedure 12(b)(6).  For the following reasons, the Court will grant

Defendants' Motion to Dismiss (DN 82).

## I.      BACKGROUND

### A.      Parties and Claims

Plaintiffs in this consolidated litigation are a proposed class that purchased or acquired

Yum!'s securities between February 6, 2012, and February 4, 2013, ("Class Period") when prices

were allegedly inflated by fraudulent misrepresentations or omissions.  (Compl., DN 72, at 1.)

On May 1, 2013, Frankfurt-Trust Investment GmbH ("Frankfurt-Trust") was appointed as Lead

Plaintiff.[1]  (Civil Mins., May 1, 2013, DN 42.)  Frankfurt-Trust is an institutional investor that

manages assets worth approximately €16 billion.  (Compl., DN 72, ¶ 19.)  On August 5, 2013,

Frankfurt-Trust filed the Complaint (DN 72), which is now under attack in Defendants' Motion

to Dismiss (DN 82).

---

[1] The other named plaintiffs in this consolidated litigation are Arun Bondali, William A. Shader, Jason Yun, and
Corey Glaser.

Defendants are Yum! and a group of its senior corporate officers.[2]  (Compl., DN 72, ¶¶ 20, 22–24.)  Yum! is a publicly traded corporation that operates a global restaurant business.  (Compl., DN 72, ¶ 20.)  The Company owns or franchises over 39,000 restaurants in more than 130 countries and territories.  (Compl., DN 72, ¶ 20.)  Yum! maintains its state of incorporation in North Carolina and its headquarters in Louisville, Kentucky.  (Compl., DN 72, ¶ 20.)

During the Class Period, the Individual Defendants held positions as Yum!'s senior corporate officers.  (Compl., DN 72, ¶¶ 22–24.)  Novak served as Yum!'s chairman of the board of directors and chief executive officer.  (Compl., DN 72, ¶ 22.)  When the Class Period began, Carucci worked as the Yum!'s chief financial officer, but on May 1, 2012, he left that position to assume his new role as the Company's president.  (Compl., DN 72, ¶ 24.)  Finally, Su served as Yum!'s vice chairman of the board of directors and chief executive officer for Yum! Restaurants China ("Yum! China").  (Compl., DN 72, ¶ 23.)

The Complaint asserts three claims against Defendants.  First, Count I alleges that Yum! violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10-5, by making fraudulent misrepresentations or omissions in connection with the purchase or sale of a security.  (Compl., DN 72, Ct. I.)  Second, Count II alleges that the Individual Defendants also committed securities fraud under § 10(b) and Rule 10b-5 through their fraudulent misrepresentations or omissions.  (Compl., DN 72, Ct. II.)  Third, Count III alleges that the Individual Defendants are liable for Yum!'s securities fraud as controlling persons under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).  (Compl., DN 72, Ct. III.)

---

[2] The docket for this case also lists Patrick Grismer as a defendant, but Lead Plaintiff did not include him in the Complaint.

### B.    Chinese Operations and Food Safety Testing

For purposes of this motion, the Court construes the Complaint in the light most favorable to Plaintiffs and accepts as true the following well-pleaded factual allegations. *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 467 (6th Cir. 2011).  Yum!'s restaurants are comprised of several different brands, but this litigation concerns its Kentucky Fried Chicken ("KFC") restaurants.  (Compl., DN 72, ¶ 20.)  Yum! separates its global operations into divisions, one of which is Yum! China.  (Form 10-K for 2011, DN 82-2, at 3.)  From its headquarters in Shanghai, Yum! China oversees all KFC restaurants located in mainland China.  (Compl., DN 72, ¶ 20.)  The growth of Yum! China has served as a major component of Yum!'s overall profitability, and that growth can be largely attributed to the success of KFC.  (Compl., DN 72, ¶¶ 30–31.)  Between 2000 and 2011, KFC restaurants accounted for eighty-five percent of Yum! China's growth.  (Compl., DN 72, ¶ 30.)

Maintaining a reputation for food safety is vital to the continued success of Yum!'s business, and the Company has recognized the importance of that issue repeatedly.  Before the Class Period, Yum!'s white papers, corporate responsibility reports, and SEC filings reflected the significance of food safety and discussed how the Company maintains strict standards across diverse markets.  (Compl., DN 72, ¶¶ 33, 40, 42–50.)  Su emphasized food safety and supply chain control in his cover letters to white papers published in 2008 and 2009.  (Compl., DN 72, ¶¶ 44–45, 49.)

Prior experience with food safety problems made Yum! aware of the potential impact of negative publicity.  In March 2005, a banned food dye with carcinogenic properties, Sudan Red Dye No.1, was discovered in the seasoning for chicken sourced to Yum! China by a local supplier.  (Compl., DN 72, ¶ 35.)  The publicity from the Sudan Red incident lowered Yum!

China's sales and precipitated a slow recovery.  (Compl., DN 72, ¶¶ 35–36)  In February 2007, Yum! experienced an E. coli outbreak at several Taco Bell restaurants in the United States, which again reduced sales.  (Compl., DN 72, ¶ 37.)  In 2008, Yum! China received media scrutiny for its supposed overuse of hormones and steroids in chickens.  (Compl., DN 72, ¶¶ 51–52.)  While appearing on a television show, Novak responded to a question concerning whether Yum! China used the same standards for administering hormones and steroids to its chickens as would be required in the United States by stating, "Absolutely we use the same standards and our food is absolutely outstanding over there."  (Compl., DN 72, ¶¶ 51–52.)

Restaurant operations in China present a more acute risk for food contamination and food-borne illness.  (Compl., DN 72, ¶ 89.)  China does not maintain integrated and industrialized poultry supply chains, where breeding, feeding, and slaughtering occur within a single operation.  (Compl. Ex. J, DN 72-10, at 6.)  Rather, China's poultry supply chains segregate farming and processing.  (Compl. Ex. J, DN 72-10, at 6.)  There, farms of any size—from family to industrial farms—may sell chickens to poultry processors.  (Compl. Ex. J, DN 72-10, at 6.)  Yum! China deals directly with those poultry processors as its suppliers, not the individual farms.  (*See* Compl. Ex. J, DN 72-10, at 6.)

To monitor China's disintegrated supply chains, the Company adopted various supplier oversight protocols.  First, Yum! China required suppliers to provide government quarantine certificates.  (Compl., DN 72, ¶ 107.)  Second, Yum! China insisted that suppliers conduct drug residue testing and present the results before any shipment was accepted.  (Compl., DN 72, ¶ 107; Compl. Ex. K, DN 72-11)  Third, Yum! created a global audit system for suppliers, known as STAR, which was designed to track and assess supplier compliance.  (Compl., DN 72, ¶¶ 48, 50.)  Fourth, Yum! China conducted an annual evaluation of each supplier.  (Compl. Ex.

O, DN 72-15.)  Finally, Yum! China performed supplemental spot tests for certain veterinary drugs after receiving poultry shipments.  (*See* Compl. Ex. J, DN 72-10, at 6.)

 In this case, the Complaint focuses on Yum! China's own spot testing of received shipments.  To complete that spot testing, Yum! China hired a third-party inspector, the Shanghai Institute for Food and Drug Control ("SIFDC"), which is affiliated with a government agency, the Shanghai Food and Drug Administration ("SFDA").  (Compl., DN 72, ¶ 54; Compl. Ex. L, DN 72-12, at 1.)  Throughout 2010 and 2011, the SIFDC notified Yum! China that eight of nineteen test samples from the Shandong Liuhe Group ("Liuhe") showed elevated levels of certain antibiotics.[3]  (Compl., DN 72, ¶¶ 56, 113.)  Liuhe is comprised of multiple processing factories, and Yum! China's spot testing results corresponded to individual factories within that system.  (*See* Compl. Ex. K, DN 72-11.)  Yum! China identified the Linyi Factory as the principal offender and, in 2011, terminated that specific facility as a supplier.  (Compl. Ex. K, DN 72-11.)  However, Yum! China continued to purchase poultry from Liuhe until August 2012.  (Compl., DN 72, ¶ 60; Compl. Ex. K, DN 72-11.)  In 2010, Yum! China also received results showing that a second supplier, the Yingtai Group ("Yingtai"), had provided poultry with elevated antibiotic levels to its KFC restaurants.  (Compl., DN 72, ¶ 119.)

 Yum! did not contact the Chinese government concerning those failed test results or voluntarily disclose the results to the public.  (Compl., DN 72, ¶ 63.)  In fact, Yum! China sold the overmedicated chicken to consumers at KFC restaurants.  (Compl., DN 72, ¶ 62.)  Su explained that, under then-prevailing procedures, Yum! China often did not receive spot test results before poultry needed to be shipped to restaurants, and once the chicken entered the

---

[3] During this series of tests, the SIFDC discovered chloramphenicol, enrofloxacin, and furaltadone.  (Compl., DN 72, ¶¶ 56–57.)

logistics system, such problems could not be cured.  (Compl., DN 72, ¶ 62; Compl. Ex. J, DN 72-10, at 5–6.)

### C.     Public Statements

The Complaint alleges that, by misrepresenting or omitting the suppliers' negative test results, Defendants made various false or misleading statements during the Class Period that artificially inflated share prices.  The Class Period began on February 6, 2012, with the filing of Yum!'s SEC Form 8-K for 2011.  (Compl., DN 72, ¶ 193.)  The first statement the Complaint cites as false or misleading is contained in that Form 8-K and reads as follows:  "Our forward-looking statements are subject to risks and uncertainties, which may cause actual results to differ materially from those projected.  Factors that can cause our actual results to differ materially include, but are not limited to:  food-borne illness or food safety issues . . . ."  (Compl., DN 72, ¶¶ 193–94.)  Defendants repeated that statement in each subsequent Form 8-K filed during the Class Period.  (Compl., DN 72, ¶¶ 214–15, 222–23, 226–27.)

On February 21, 2012, Yum! filed its SEC Form 10-K for 2011, which was authorized and signed by the Individual Defendants.  (Compl., DN 72, ¶ 198.)  The Complaint alleges that the Form 10-K contained three separate false or misleading statements.  First, in a section discussing legal actions in which Yum! is involved, the Form 10-K stated,

**Legal Proceedings.**

The following is a brief description of the more significant of the categories of lawsuits and other matters we face from time to time.
. . . .

**Suppliers**

The Company purchases food, paper, equipment and other restaurant supplies from numerous independent suppliers throughout the world.  These suppliers are required to meet and maintain compliance with the Company's standards and specifications.  On occasion, disputes arise between the Company and its

-6-

suppliers on a number of issues, including, but not limited to, compliance with product specifications and terms of procurement and service requirements.

(Compl., DN 72, ¶ 201.)  Second, the Complaint asserts that the Form 10-K's description of restaurant standards for food quality and safety was a false or misleading statement.  In pertinent part, that description stated,

The Company is committed to conducting its business in an ethical, legal and socially responsible manner.  All restaurants, regardless of their ownership structure or location, must adhere to strict food quality and safety standards.  The guidelines are translated to local market requirements and regulations where appropriate and without compromising the standards.

(Compl., DN 72, ¶ 203.)  Third, the Complaint alleges that the Form 10-K's risk factors, which discuss significant factors that may affect Yum!'s prospective performance, contained false or misleading statements.  Those risk factors appeared as follows:

**Risk Factors.**

You should carefully review the risks described below as they identify important factors that could cause our actual results to differ materially from our forward-looking statements and historical trends.

*Food safety and food-borne illness concerns may have an adverse effect on our business.*

Food-borne illnesses, such as E. coli, hepatitis A, trichinosis or salmonella, and food safety issues have occurred in the past, and could occur in the future.  Any report or publicity linking us or one of our Concept restaurants, including restaurants operated by our franchisees, to instances of food-borne illness or other food safety issues, including food tampering or contamination, could adversely affect our Concepts' brands and reputations as well as our revenues and profits.  If a customer of our Concepts or franchisees becomes ill from food-borne illnesses, we and our franchisees may temporarily close some restaurants, which would decrease our revenues.  In addition, instances of food-borne illness, food tampering or food contamination solely involving our suppliers or distributors or solely at restaurants of competitors could adversely affect our sales as a result of negative publicity about the foodservice industry generally.  Such instances of food-borne illness, food tampering and food contamination may not be within our control.  The occurrence of food-borne illnesses or food safety issues could also adversely affect the price and availability of affected ingredients, which could

result in disruptions in our supply chain and/or lower margins for us and our franchisees.

(Compl., DN 72, ¶ 199.)  The statements contained in the Form 10-K were incorporated by reference into each subsequent SEC Form 10-Q filed during the Class Period.  (Compl., DN 72, ¶¶ 216–19, 222–23, 226–27.)

The third source of an alleged false or misleading statement is Carucci's response to an investor analyst during a March 8, 2012, conference.  The Complaint relies on the following exchange:

> Q:  Unidentified Audience Member
> In China, political risk seems to rear its ugly head once in a while.  You're probably maybe what they would call too big to mess with, but I'm not sure.  What kind of challenges do you have potentially?  And related to that, what do you do about controlling food quality and making sure there isn't any problem there?
>
> A:  Carucci
> In terms of food supply, that's something that we spend a lot of time and energy on.  And we've had some issues in the distan[t] past on that. . . . And we obviously work a lot with our suppliers.  So I think the amount of time and attention we've put in China is probably higher than anywhere in the world.  But realistically, we know there's probably more risk there than there is in places like Western Europe and the U.S. in terms of just the way the food chain works.  But we've spent a lot of time and energy getting that right and having the right suppliers.

(Compl., DN 72, ¶ 207.)

Next, the Complaint alleges that Yum!'s Code of Conduct contained false or misleading statements in the following passages:

> Food safety is a primary responsibility of Yum!, and nothing, including cost, is allowed to interfere with this responsibility.
>
> To ensure that our customers receive safe, wholesome food, and "food you crave," Yum!:
> - Maintains strict specifications for raw products including specifications which meet or exceed government requirements.
> - Adheres to a strict food safety testing program.

. . . .
- Continually monitors and improves its procedures and practices to ensure food safety.

The responsibility for food safety is shared by everyone in our system:
- As an employee you are expected to immediately report any problem with food safety to your supervisor or the next level of management.
- Any product suspected to be unsafe must immediately be pulled from distribution until safety can be assured.

(Compl., DN 72, ¶ 211.)  On April 4, 2012, Yum!'s board of directors, which included Novak and Su, issued a proxy statement explaining that the Code of Conduct applied to all employees and that the corporate executives had certified their review of the Code in writing.  (Compl., DN 72, ¶¶ 209–10.)

Finally, the Complaint alleges that several of Yum!'s responses to negative media reports were false or misleading statements.  First, on November 23, 2012, Bloomberg News published an article concerning the use of prohibited growth hormone stimulants on poultry by the Shanxi Suhai Group, a Yum! China supplier.  Bloomberg News paraphrased the response of a Yum! representative:  "[Yum!] watches food safety very closely, expects all its chicken meat suppliers to follow strict food safety rules, and conducts random checks on the products."  (Compl., DN 72, 228–29.)

Second, in December 2012, Yum! China received media attention for the accelerated growth rates of certain chickens and the corresponding food safety risks.  (Compl., DN 72, ¶ 240.)  In response, on December 7, 2012, Yum! posted the following on its Chinese website: "All chickens will undergo inspection by the government, suppliers and KFC before entering KFC.  KFC will continue to supervise all the suppliers, strengthen the management of the suppliers continuously to ease people's concern about food safety risks and keep the superior and eliminate inferior suppliers to minimize the risks."  (Compl., DN 72, ¶ 240.)

Third, on December 18, 2012, Chinese Central Television ("CCTV") reported that an undercover investigation revealed flaws in Yum!'s food safety protocols for suppliers.  (Compl., DN 72, ¶ 245.)  The CCTV report accused Yum! of accepting poultry from its suppliers that had tested positive for banned antibiotics and failing to adequately monitor the quality of its raw product supply.  (Compl., DN 72, ¶ 246.)  In response, Yum! posted the following statement on KFC's Chinese website:  "KFC requires all suppliers to conduct drug residue inspections of their chicken products supplied to KFC. . . . KFC makes spot checks on drug residues in all the chickens purchased."  (Compl., DN 72, ¶ 247.)

### D.    Disclosure of the Suppliers' Failed Test Results

The December 18, 2012, CCTV report served as the first major disclosure of Yum!'s supplier problems.  (Compl., DN 72, ¶ 106.)  That CCTV report mentioned the overuse of antibiotics by Liuhe and Yingtai specifically.  (Compl., DN 72, ¶ 106.)  The next day, on December 19, the SFDA launched an investigation into Yum! China's poultry supply.  (Compl., DN 72, ¶ 109.)  On December 20, 2012, Bloomberg News reported that, during 2010 and 2011, Yum! received notice of multiple failed test results for Liuhe and Yingtai.  (Compl., DN 72, ¶ 113.)

Prior to the market's close, on December 21, 2012, Yum! filed a press release with the SEC that discussed the investigation into its supply problems.  (Compl., DN 72, ¶ 116.)  The press release admitted that two suppliers provided Yum! China with poultry containing unapproved levels of antibiotics and also stated that the recent publicity had caused a moderate sales decline.  (Compl., DN 72, ¶ 116.)

On January 25, 2013, the SFDA concluded its investigation of Yum! China's poultry supply.  (Compl., DN 72, ¶ 133.)  The SFDA provided Yum! China with a set of supervisory

recommendations to strengthen its supply chain practices and improve its voluntary testing procedures.  (Compl., DN 72, ¶ 133.)  The SFDA decided not to bring a case or assess a fine against Yum! China.  (Compl., DN 72, ¶ 133.)

On the final day of the Class Period, February 4, 2013, Yum! filed its SEC Form 8-K for 2012 in which it announced a decrease in sales and operating profits.  (Compl., DN 72, ¶¶ 131–32.)  The Form 8-K also explained that Yum! no longer expected to achieve its growth goals for 2013.  (Compl., DN 72, ¶ 132.)  Between the first negative media reports on November 23, 2012, and the Class Period's end on February 5, 2013, Yum!'s share price dropped approximately seventeen percent, from $74.47 to $62.08.  (Compl., DN 72, ¶¶ 94–135.)

On February 25, 2013, Su announced Operation Thunder, a program designed to improve Yum! China's food safety practices and reassure the public.  (Compl., DN 72, ¶ 137.)  Operation Thunder's initiatives included the following:  (1) increasing the frequency and sophistication of testing; (2) terminating small, high-risk suppliers; (3) developing a mechanism to share results with the Chinese government; (4) adopting a zero-tolerance policy for suppliers that cannot control their farmers.  (Compl., DN 72, ¶ 137.)

During an interview, on May 25, 2013, Su explained that Yum! did not disclose the failed test results to safeguard the reputation and goodwill of its suppliers.  (Compl., DN 72, ¶¶ 74–75.)  Su also asserted that the antibiotics discovered by the tests did not pose a severe risk to the public's health.  (Compl., DN 72, ¶¶ 74–75.)  Using Liuhe as an example, Su stated,

> After you come out and discover it, what would you do about it?  Would you really want to hang Liuhe out to dry?  This is a really tough call to make.  And besides, this drug, honestly, even if people added it to the chicken, you can't really say that it would take away people's lives or that it would be so harmful to their bodies.  It's just a question of people developing a resistance to antibiotics as a result of eating too much chicken.  This is not something that poses an immediate threat to the human body . . . it's not a very serious food safety crisis.  So in light of these circumstances, as a company, should we carelessly disclose

someone's violations, ruining his or her goodwill and even their business?  Do we have this power?  In fact, these things are all worth thinking about.

(Compl. Ex. J, DN 72-10, at 4–5.)

## II.     STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Frank v. Dana Corp.* (*Frank II*), 646 F.3d 954, 958 (6th Cir. 2011).  When ruling on such a motion, the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true. *Ashland*, 648 F.3d at 467.  In doing so, however, the court will not accept as true legal conclusions or unwarranted factual inferences. *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008) (citing *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997)); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).  The court must weigh the complaint's allegations in their entirety and examine other sources ordinarily reviewed when ruling on such a motion, "in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[4]  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007).

A securities fraud claim arising under § 10(b), like any claim for fraud, must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010).  Rule 9(b) requires the plaintiff

---

[4] *See* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004 & Supp. 2014) ("In determining whether to grant a Federal Rule 12(b)(6) motion, district courts primarily consider the allegations in the complaint.  The court is not limited to the four corners of the complaint, however.  Numerous cases . . . have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment.  These matters are deemed to be a part of every complaint by implication." (footnote omitted)).

to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  To

comply with Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends

were fraudulent, (2) identify the speaker, (3) state where and when the statements were made,

and (4) explain why the statements were fraudulent."  *Frank v. Dana Corp.* (*Frank I*), 547 F.3d

564, 570 (6th Cir. 2008) (quoting *Gupta v. Terra Nitrogen Corp.*, 10 F. Supp. 2d 879, 883 (N.D.

Ohio 1998)) (internal quotation marks omitted).

Additionally, a securities fraud claim must meet the more exacting pleading requirements

imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.

Securities fraud litigation is especially prone to "'strike suits' aimed at jackpot discovery and

predatory settlement."[5]  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547 (6th Cir. 2001) (en banc).  In

response, Congress enacted the PSLRA "to curb frivolous, lawyer-driven litigation, while

preserving investors' ability to recover on meritorious claims."  *Tellabs*, 551 U.S. at 322.  Under

the PSLRA, a private securities complaint that alleges fraudulent misrepresentations or

omissions of material fact must (1) "specify each statement alleged to have been misleading

[and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), and (2)

"state with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind,"  *Id.* § 78u-4(b)(2).

## III.  DISCUSSION

### A.  Securities Fraud Claims

Section 10(b) of the Securities Exchange Act, makes it unlawful for any person to "use or

employ, in connection with the purchase or sale of any security[,] . . . any manipulative or

---

[5] *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975) (recognizing that the discovery process in securities fraud litigation "permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence").

deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements § 10(b) by declaring it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b)–(c).  Section 10(b) affords an implied private right of action to purchasers and sellers of securities injured by its violation.  *Tellabs*, 551 U.S. at 318.

To state a securities fraud claim under § 10(b) and Rule 10b-5, a plaintiff must allege the following:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008); *see In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999). Defendants' Motion to Dismiss challenges the securities fraud allegations on two grounds.  First, Defendants argue that the Complaint fails to plead with particularity a material misrepresentation or omission.  Second, Defendants assert that the Complaint fails to plead a strong inference of scienter.  For convenience, the Court will analyze the securities fraud claims of Counts I and II concurrently.

### 1.    Material Misrepresentation or Omission

Successfully pleading a material misrepresentation or omission requires the plaintiff to allege facts demonstrating (1) that the defendant made a statement or omission that was false or misleading and (2) that this statement or omission concerned a material fact.  *In re Omnicare,*

*Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014).[6]  The plaintiff may proceed under two possible theories of liability—a misrepresentation theory or an omission theory—each requiring a distinct analytical framework and further varying based on whether the misrepresentation or omission relates to hard or soft information.  *Id.*

A misrepresentation is an affirmative statement that is false or misleading based on facts held by the defendant when the statement was made.  *Id.*  When an alleged misrepresentation involves hard information, the plaintiff must plead facts "showing that the statement concerned a material fact and that it was objectively false or misleading."  *Id.*  "Hard information 'is typically historical information or other factual information that is objectively verifiable."  *Sofamor Danek*, 123 F.3d at 401 (quoting *Garcia v. Cordova*, 930 F.2d 826, 830 (10th Cir. 1991)).  In contrast, soft information "includes predictions and matters of opinion."  *Id.*  If an alleged misrepresentation involves soft information, the plaintiff must also plead facts "showing that the statement was 'made with knowledge of its falsity.'"[7]  *Omnicare*, 769 F.3d at 470 (quoting *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.* (*Omnicare I*), 583 F.3d 935, 945–46 (6th Cir. 2009)).

Alternatively, an omission theory focuses on the defendant's failure to disclose information when it had a duty to do so.  *Id.* at 471.  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).  An affirmative duty to disclose may result from insider trading, a statute requiring disclosure, or, as relevant here, an incomplete or misleading prior disclosure.

---

[6] Though the Sixth Circuit issued its opinion in *Omnicare*, 769 F.3d at 455, after the parties completed the briefing for this motion, no supplemental briefing is necessary.  The *Omnicare* court did not modify the law as it relates to material misrepresentations and omissions.  *Id.* at 469.  Instead, the court merely "attempt[ed] to state the doctrine simply and in a straightforward manner in the hope of clearing away any confusion."  *Id.*

[7] This subjective inquiry into the defendant's knowledge of falsity is conducted as part of the scienter analysis and should not muddle the otherwise objective inquiries of the material-misrepresentation element.  *Omnicare*, 769 F.3d at 470–71.  In this case, the Court will not conduct a knowledge-of-falsity inquiry because the information allegedly misrepresented is hard, rather than soft.

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005).  "[A] party who discloses material facts in connection with securities transactions 'assume[s] a duty to speak fully and truthfully on those subjects.'"  *Helwig*, 251 F.3d at 561(quoting *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998) (en banc)).  The defendant must disclose newly acquired hard information when that information "renders a prior disclosure objectively inaccurate, incomplete, or misleading." *Omnicare*, 769 F.3d at 471.  If the new information is soft, however, the defendant has a duty to disclose that information only if it is "'virtually as certain as hard facts' and contradicts the prior statement." *Id.* (quoting *Sofamor Danek*, 123 F.3d at 402).

Therefore, both the misrepresentation and omission theories of liability require the plaintiff to plead facts that satisfy the materiality component of § 10(b) and Rule 10b-5.  *Id.* Assessing materiality is a "fact-specific inquiry" that "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic*, 485 U.S. at 240. This inquiry demands that the court pay close attention to the context of the defendant's statements and the withheld or misrepresented facts. *Matrixx Initiatives, Inc. v. Siracusano*, — U.S. —, 131 S. Ct. 1309, 1321, 179 L. Ed. 2d 398 (2011); *Omnicare*, 769 F.3d at 478. "Misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'" *Sofamor Danek*, 123 F.3d at 400 (quoting *Basic*, 485 U.S. at 232).  Immaterial statements are those statements upon which a reasonable investor would not rely, including "'vague, soft, puffing statements or obvious hyperbole.'" *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (quoting *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002)).  Regarding such statements,

-16-

> [c]ourts everywhere "have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting opinions of the speaker, that no reasonable investor could find them important to the total mix of information available."

*Id.* at 570–71 (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996)).

Here, the Complaint asserts liability based on both misrepresentations and omissions, alleging that Defendants public statements during the Class Period affirmatively misrepresented or misleadingly omitted the failed test results of Yum!'s Chinese suppliers.  (Compl., DN 72, ¶¶ 189–91.)  As misrepresented or omitted facts, those failed test results constitute hard information because they can be verified objectively.  *See Sofamor Danek*, 123 F.3d at 401.  That conclusion permits the analytical frameworks for misrepresentations and omissions to be consolidated in major respects.  The Court will focus on three central issues:  (1) whether the Defendants' alleged misrepresentations or omissions concerned material fact, (2) whether the Defendants' public statements were objectively false or misleading in light of the misrepresented or omitted test results, and (3) whether Defendants' assumed a duty to disclose the omitted test results.  *See Omnicare*, 769 F.3d at 470–72.

### a.      Materiality

Defendants' public statements during the Class Period can be divided into two categories: (1) statements of the risk and uncertainty posed by food safety problems and (2) statements concerning the quality of Yum!'s food safety program.  The Court will address the materiality of statements in each of those categories in turn.

### i.      Statements of Risk and Uncertainty

The first category of public statements contains Defendants warnings that food safety problems present a risk and uncertainty to Yum!'s business performance.  The Complaint refers

to each of the following statements as a material misrepresentation or omission.  First, in the

Form 8-K for 2011, Defendants stated that future projections are subject to "risks and

uncertainties" and "[f]actors that can cause actual results to differ materially include . . . food-

borne illness or food safety."[8]  (Compl., DN 72, ¶¶ 193–94.)  Second, in the "Legal Proceedings"

section of the Form 10-K for 2011, which discusses common lawsuits faced by the business,

Defendants stated that "suppliers are required to meet and maintain compliance with the

Company's standards and specifications," and "[o]n occasion, disputes arise between the

Company and its suppliers on a number of issues, including . . . compliance with products

specifications and terms of procurement and service requirements."  (Compl., DN 72, ¶ 201.)

Third, in the "Risk Factors" section of that same Form 10-K, Defendants announced that "food

safety issues have occurred in the past, and could occur in the future."  (Compl., DN 72, ¶ 199.)

Fourth, the "Risk Factors" section also emphasized that "instances of food-borne illness, food

tampering or food contamination solely involving our suppliers or distributors . . . could

adversely affect our sales as a result of negative publicity" and "[s]uch instances of food-borne

illness, food tampering and food contamination may not be within our control."[9]  (Compl.,

DN 72, ¶ 199.)

　　　　Defendants' statements of the risk and uncertainty presented by food safety problems are

not the type of statements that a reasonable investor would find important in the total mix of

available information.  *See, e.g.*, *Cement & Concrete Workers Dist. Council Pension Fund v.

Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1141 (N.D. Cal. 2013); *Peters v. Jinkosolar

Holding Co.*, 2013 WL 754712, at *5–8 (S.D.N.Y. Feb. 27, 2013); *In re FBR Inc. Sec. Litig.*, 544

---

[8] The analysis of this statement also applies to each subsequent Form 8-K in which the statement was repeated.
(Compl., DN 72, ¶¶ 214–15, 222–23, 226–27.)
[9] The analysis of the statements contained in the Form 10-K for 2011 also applies to each subsequent Form 10-Q in
which those statements were incorporated by reference.  (Compl., DN 72, ¶¶ 216–19, 222–23, 226–27.)

F. Supp. 2d 346, 360–63 (S.D.N.Y. 2008).  Such boilerplate recitations of risk are ubiquitous in the securities marketplace.  Defendants' risk statements speak in general terms and say nothing specific from which a reasonable investor could infer anything about the present state of food safety within the Company.  Additionally, the risk statements do not assert that Yum!'s business is presently free of any potential for food safety problems to damage performance.  In fact, the risk statements were issued to alert investors that food safety problems might hinder performance and to inform them of common circumstances that lead to such issues.

For example, regarding Defendants' warning that disputes over supplier compliance may arise, *Ford* provides useful instruction.  381 F.3d at 563.  There, the defendants flatly stated that they were "insisting [their] suppliers maintain . . . stringent quality standards." *Id.* at 571.  In concluding that the statement was immaterial, the court reasoned that what the defendants are "insisting [their] suppliers do would not be interpreted by an investor as a representation that . . . [their] suppliers maintain the quality standards [they] ask[]." *Id.*  The *Ford* statement was a confident assertion of the intent to ensure supplier compliance, and still the court found it immaterial and unworthy of a reasonable investor's attention.  *Id.*  In comparison, a reasonable investor would give even less weight to Defendants' discussion of supplier compliance as a frequent source of legal proceedings.  Difficulties resulting from supplier compliance occur in nearly all businesses that sell goods, and the food industry is particularly susceptible to such problems—a reality that is known in the marketplace.

Defendants' risk statements lack any specific information and offer only nebulous descriptions of broad classes of risk.  Such statements are often heard in the securities marketplace and are insignificant in the decision-making calculus of a reasonable investor.

Therefore, the Court concludes that Defendants' statements of the risk and uncertainty posed by food safety problems did not concern material fact.

### ii.      Statements Concerning the Quality of Yum!'s Food Safety Program

The second category of public statements consists of statements concerning the quality of Yum!'s food safety program.  The Complaint alleges that each of the following statements is a material misrepresentation or omission.  First, in the Form 10-K for 2011, Defendants stated that "[a]ll restaurants . . . must adhere to strict food quality and safety standards" and "guidelines are translated to local market requirements and regulations where appropriate and without compromising the standards."  (Compl., DN 72, ¶ 203.)  Second, in the Code of Conduct, Defendants stated that Yum! "[m]aintains strict specifications for raw products including specifications that meet or exceed government requirements," "[a]dheres to a strict food safety testing program," and "[c]ontinually monitors and improves its procedures to ensure food safety."  (Compl., DN 72, ¶ 211.)  Third, the Code of Conduct further asserted that "[a]ny product suspected to be unsafe must immediately be pulled from distribution until safety can be assured."  (Compl., DN 72, ¶ 211.)  Fourth, when responding to a question regarding the Chinese food supply, Carucci stated,

> In terms of food supply, that's something that we spend a lot of time and energy on.  And we've had some issues in the distan[t] past on that. . . . And we obviously work a lot with our suppliers.  So I think the amount of time and attention we've put in China is probably higher than anywhere in the world.  But realistically, we know there's probably more risk there than there is in places like Western Europe and the U.S. in terms of just the way the food chain works.  But we've spent a lot of time and energy getting that right and having the right suppliers.

(Compl., DN 72, ¶ 207.)  Fifth, a November 23, 2012, Bloomberg News article paraphrased a Yum! representative as saying that the Company "watches food safety very closely, expects all chicken meat suppliers to follow strict food safety rules, and conducts random checks on the

products."  (Compl., DN 72, 228–29.)  Sixth, on December, 7, 2012, Yum! posted the following

on its Chinese website:  "All chickens will undergo inspection by the government, suppliers and

KFC before entering KFC.  KFC will continue to supervise all the suppliers, strengthen the

management of the suppliers continuously to ease people's concern about food safety risks and

keep the superior and eliminate inferior suppliers to minimize the risks."  (Compl., DN 72,

¶ 240.)  Finally, in a December 18, 2012, website post, Yum! stated that "KFC requires all

suppliers to conduct drug residue inspections of their chicken products supplied to

KFC. . . . KFC makes spot checks on drug residues in all the chickens purchased."[10]  (Compl.,

DN 72, ¶ 247.)

    *City of Monroe* offers important guidance in the Court's analysis of Defendants'

statements.  399 F.3d at 651.  In *City of Monroe*, the plaintiffs alleged that the defendants made

material misrepresentations or omissions by touting the quality and safety of tires they

manufactured without disclosing known adverse information.  *Id.* at 670.  The known adverse

information included internal testing that showed a high rate of tire failure, lawsuits for vehicle

roll-overs caused by tire defects, and foreign government investigations into tire safety.  *Id.* at

672.  During the relevant time period, the defendants stated that the company sold "the best tires

in the world," that it had "no reason to believe there is anything wrong with [the tires]," that its

products demonstrated "global consistent quality," and that "[r]igorous testing under diverse

conditions at our proving grounds around the world helps ensure reliable quality for original

equipment customers."  *Id.* at 670 (internal quotation marks omitted).  The court concluded that

those statements were immaterial and therefore did not give rise to a duty to disclose additional

facts.  *Id.* at 671.  The court explained that such statements "are best characterized as loosely

---

[10] Lead Plaintiff did not defend this alleged misrepresentation or omission in its Opposition to Defendants' Motion to Dismiss the Consolidated Complaint (DN 84).  The Court includes the statement here to be thorough in its materiality analysis.

optimistic statements insufficiently specific for a reasonable investor to 'find them important to the total mix of information available.'" *Id.*

However, the court reached the opposite conclusion when considering the materiality of the defendants' statement that "[w]e continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires." *Id.* at 671–72 (internal quotation marks omitted).  The timing of the "objective data" statement appeared to be in direct response to lawsuits and other public challenges, and the defendants did not point to any actual data in the record that supported the statement's truth.  *Id.* at 672. Accordingly, the court concluded that, "once [the defendants] elected to make statements such as the statement regarding the 'objective data,' it was required to qualify that representation with known information undermining (or seemingly undermining) the claim." *Id.* at 673.

Here again, the Complaint alleges only immaterial statements, "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Id.* at 671.  Defendants' statements repeat vague, subjective assertions, such as "strict" food safety standards, watching food safety "very closely," having the "right" suppliers, and keeping "superior" and eliminating "inferior" suppliers.  (Compl., DN 72, ¶¶ 203, 207, 211, 228–29, 240.)  Those terms constitute the mere opinions of management and hold no obvious, objective meaning to a reasonable investor.  *See City of Monroe*, 399 F.3d at 670–71; *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 829 (W.D. Mich. 2012).  Unlike *City of Monroe*'s "objective data" statement, Defendants' statements do not attempt to justify the opinions by referring to purported hard evidence.  The statements, "both on their own terms and in context, lack[] a standard against which a reasonable investor could expect them to be pegged." *City of Monroe*, 399 F.3d at 671.

-22-

Moreover, the December 7, 2012, website post, which stated, "All chickens will undergo inspection by the government, suppliers and KFC before entering KFC," (Compl., DN 72, ¶ 240.), contains no content from which a reasonable investor could gauge the type and thoroughness of the inspections. Without more specific language, a reasonable investor would take that statement as yet another positive assertion floating about the marketplace. This statement concerning inspections is bereft of detail and was accompanied by other immaterial assertions. In its terms and context, the statement is simply too vague to be material.

The Complaint's reliance on Yum!'s Code of Conduct as a source of material misrepresentations and omissions is also misplaced. The adoption of a code of conduct does not imply that a corporation or its employees always comply with the code's guidelines. *Hewlett Packard*, 964 F. Supp. 2d at 1138–39; *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 859 (N.D. Ill. 2009); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 685–686 (D. Colo. 2007). Often required by regulators or stock exchanges, the essentially mandatory nature of adopting a code of conduct makes clear to investors that "all public companies—whether run by crooks or angels—will adopt just such a code." *Andropolis*, 505 F. Supp. 2d at 685–86. That fact alone would dissuade a reasonable investor from affording a code of conduct any importance in an investment decision, but such codes are also "inherently aspirational." *Id.* at 686. Codes of conduct state how a corporation or its employees ought to behave, not how they actually behave. For those reasons, the statements in Yum!'s Code of Conduct are insignificant in the total mix of available information.

A reasonable investor would pay little, if any, attention to Defendants' statements concerning the quality of Yum!'s food safety program. Those statements are vague and subjective, evidencing only the opinion of management, or derived from sources that are

aspirational, rather than reliable.  Therefore, the Court concludes that Defendants' statements concerning the quality of Yum!'s food safety program, like their risk statements, did not concern material fact.

### b.    Objective Falsity

A reasonable jury, considering Defendants' public statements in light of the failed test results, could not conclude that those statements were objectively false or misleading.  First, the statements acknowledging the risk and uncertainty associated with food safety problems are consistent with the failed test results.  Defendants did not guarantee that food safety problems would never occur or that the current potential for problems was negligible.  Those statements informed investors that food safety problems may occur, that such problems may originate with suppliers, and that the problems may have a negative impact on Yum!'s business performance.  Rather than undermine the truth of Defendants' risk statements, the failed test results confirm it.

Second, the objective truth or falsity of Defendants' statements concerning the quality of Yum!'s food safety program cannot be determined.  As discussed above, those statements are phrased in subjective terms.  Assessing the veracity of those terms can only be characterized as a matter of opinion.  The one statement that does contain some objective content—the December 7, 2012, website post concerning inspections by the government, suppliers, and Yum!—is not contradicted by the Complaint's exhibits or the failed test results.  (Compl., DN 72, ¶ 240.) The Complaint's exhibits repeatedly mention that Yum!'s food safety program included government quarantine certificates, testing by suppliers, and voluntary spot testing by SIFDC, which maintained a government affiliation.  (Compl. Ex. I, DN 72-9; Compl. Ex. K, DN 72-11.) Moreover, the failed test results relate to a time period prior to Yum!'s statement concerning inspections.  Though Lead Plaintiff disputes the adequacy of Yum!'s inspection procedures, the

simple fact that failed test results exist supports Defendants' assertion that such procedures were in place.  For those reasons, the Court concludes that a reasonable jury could not find Defendant's statements objectively false or misleading in light of the failed test results.

### c.    Duty to Disclose

The foregoing materiality and falsity analyses simplify the issue of whether Defendants assumed a duty to disclose the omitted test results.  Though "a party who discloses *material facts* in connection with securities transactions 'assume[s] a duty to speak fully and truthfully on those subjects,'" no duty to disclose arises from disseminating immaterial or non-misleading information.  *Helwig*, 251 F.3d at 561 (quoting *Rubin*, 143 F.3d at 268) (emphasis added).  A duty to disclose exists only to the extent necessary to cure the misleading nature of a material statement.  *See Rubin*, 143 F.3d at 267 ("The question thus is not whether [a party's] silence can give rise to liability, but whether liability may flow from [its] decision to speak . . . *concerning material details* . . . , without revealing certain additional known facts necessary to make [its] statements not misleading. (emphasis added)).  While a reasonable investor might view the failed test results, in isolation, as useful information, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."[11]  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).  The Court has already concluded that Defendants' statements did not concern material fact and that, in light of the failed test results, those subjective, immaterial statements could not be considered objectively false or misleading.  Therefore, the Court also concludes that Defendants' did not assume an affirmative duty to disclose the omitted test results.

---

[11] *See Matrixx*, 131 S. Ct. at 1322–23 ("Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market.")

The opposite conclusion here would encourage corporations "simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." *Basic*, 485 U.S. at 231 (quoting *TSC Indus.*, 426 U.S. at 448–49) (internal quotation marks omitted).  Any business that tests its suppliers' products will inevitably discover defective or otherwise unacceptable items.  The purpose of a supplier testing program is to discover such instances of noncompliance.  If suppliers could always be trusted to tender perfect products, testing programs would not be necessary.  Saddling a corporation, such as Yum!, with a duty to disclose its suppliers' test results each time it discusses, in the most general terms, the quality of its products or the risks surrounding those products would incentivize that corporation to dump a unmanageable number of test results on investors to avoid potential liability for securities fraud.

Because the allegations do not establish materiality, objective falsity, or a duty to disclose, the Complaint fails to allege a material misrepresentation or omission made by Defendants.  For that reason, the Complaint's allegations of securities fraud are inadequate, and Counts I and II will be dismissed for failure to state a claim.

### 2.    Strong Inference of Scienter

Defendants also contend that the Complaint fails to plead a strong inference of scienter. The mental state of scienter encompasses the "knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008); *see Comshare*, 183 F.3d at 550.  "Recklessness is defined as 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.  While the danger need not be known, it must at least be so obvious that a reasonable man would have known of it." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004) (quoting *Mansbach v. Prescott,*

*Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979)).  Distinct from mere negligence, recklessness is "akin to conscious disregard."  *Comshare*, 183 F.3d at 550.

When deciding whether a complaint pleads a strong inference of scienter, the court must, of course, accept all factual allegations as true and weigh the complaint and other sources ordinarily considered in their entirety.  *Tellabs*, 551 U.S. at 322.  The proper inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that requirement." [12]  *Id.* at 322–23.  That inquiry requires the court to engage in an "inherently comparative" analysis because the "strength of an inference cannot be decided in a vacuum."  *Id.* at 323.  Hence, "the court must take into account plausible opposing inferences."  *Id.*  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[13]  *Id.* at 324.  Though the Court previously concluded that the Complaint fails to plead any material misrepresentations or omissions, for the purposes of its scienter analysis, the Court will assume that the Complaint's factual allegations satisfy that first element of a securities fraud claim.

---

[12] In *Helwig*, the Sixth Circuit enumerated a non-exhaustive list of factors that are "usually relevant" in evaluating scienter pleadings:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

251 F.3d at 552.  In this case, the factual allegations in no way implicate *Helwig* factors (1), (4), (5), (7), and (8).  The Court will address the remaining factors, at least indirectly, in its holistic analysis of the scienter allegations.
[13] *See Frank I*, 547 F.3d at 570–71 (discussing the "at least as compelling" standard and recognizing that, after *Tellabs*, the Sixth Circuit's "most plausible" standard is no longer good law).

### a.      Allegations of Scienter

The Complaint asserts that the following allegations establish a strong inference that Defendants acted with scienter because they knew or should have known of the suppliers' failed test results and the false or misleading nature of their public statements.  First, Yum! China received notice of its supplier's failed test results throughout 2010 and 2011, but it did not disclose those results to the Chinese government or the public.  Second, the failed test results implicated core operations of Yum!'s business because Yum! China represents a large portion of the Company's overall profitability.  Third, Yum! China's business is particularly susceptible to food safety problems, and the Individual Defendants understood that high risk in light of previous instances of contamination, the nature of Chinese poultry supply chains, and acknowledgement of that susceptibility in the Company's risk statements, white papers, and corporate responsibility reports.  Fourth, the Individual Defendants could have accessed and reviewed the suppliers' failed test results on STAR.  Fifth, the Individual Defendants should have known of the failed test results because the Code of Conduct provides that each employee is "expected to immediately report any problem with food safety to [his] supervisor or the next level of management."  (Compl., DN 72, ¶ 211.)  Sixth, Defendants responded to negative media reports without revealing the suppliers' failed test results in close proximity to the unplanned public disclosure of those results.  Seventh, the Individual Defendants concealed the failed test results to maintain Yum!'s growing profits, to ensure higher compensation, and to protect their personal reputations.

In addition, the Complaint alleges certain facts to establish a strong inference of scienter with respect to particular Individual Defendants.  The Complaint alleges that Novak's 2008 television appearance in which he discussed food safety standards for Chinese poultry shows that

he paid close attention to that issue and should have known of the suppliers' failed test results. Next, the Complaint asserts that Carucci spoke with certainty in his March 8, 2012, response to the investor analyst's question and therefore he must have known of the current state of the Chinese supply chain and the failed test results.  The Complaint also alleges that Su knew or should have known of the suppliers' failed tests results because he oversaw Yum! China's operations directly and maintained an intense, personal focus on food safety and drug residue testing as evidenced by his statements and cover letters to white papers.  Finally, the Complaint alleges that Su's May 25, 2013, discussion of Yum!'s excuses for failing to disclose the negative test results demonstrates that he knew of those results during the Class Period.

      **b.**     **Holistic Analysis of Scienter Allegations**

      **i.**     **Individual Defendants' Scienter**

When reviewed holistically, the Complaint's factual allegations do not establish a strong inference of scienter with respect to any Individual Defendant.  The Complaint relies solely on allegations of circumstantial evidence that the Individual Defendants knew or should have known of the suppliers' failed test results and the misleading effect of misrepresenting or omitting those results.  There are no allegations of direct evidence—no smoking gun—indicating that the Individual Defendants acted with knowledge of the failed test results, such as a report of the results directed to senior management or specific conversations or meetings concerning the results.

The Complaint's allegations of scienter focus primarily on various important aspects of Yum!'s business:  (1) Yum! China's growth and profitability, (2) the adverse impact of food safety problems, and (3) the high risk for such problems presented by Chinese supply chains. From the significance of those issues, the Complaint infers that the Individual Defendants knew

or should have known of the suppliers' failed test results and the necessity of disclosing them. However, the Court considers that inference strained. The fact that the Individual Defendants, as senior corporate officers, were aware of the foregoing issues does not make it reasonable to infer that they also knew or should have known of each failed tests result arising from the Company's Chinese operations. While the Individual Defendants understood the broad challenges facing Yum!, the probability that they reviewed the test results of every Chinese supplier or that a reasonable corporate officer in the same circumstances would undertake such a review is low.

For the same reasons, the Complaint's allegations concerning Novak's 2008 television appearance, Carucci's response to the investor analyst, and Su's personal focus on food safety and drug residue testing are likewise unpersuasive. The Complaint cites those examples as evidence that the Individual Defendants knew or should have known of the suppliers' failed test results. Again, the inference that general familiarity with important aspects of Yum!'s business demonstrates knowledge or the need to obtain knowledge of specific test results is weak.

Next, the Complaint alleges that the Individual Defendants knew or should have known of the suppliers' failed test results because they could have accessed and reviewed those test results on STAR. Regarding the availability of test results on STAR, which served as an auditing system for all of Yum!'s suppliers, the Individual Defendants' fraudulent intent or recklessness cannot be presumed merely from their high-level positions and alleged access to information. *See PR Diamonds*, 364 F.3d at 688. The Complaint must do more than point out access and opportunity. It must allege specific facts showing that the Individual Defendants actually reviewed the STAR records or failed to review the records when a reasonable person would have done so.

-30-

The Complaint further alleges that the Individual Defendants knew or should have known of the failed test results because the Code of Conduct required employees to report food safety problems to their supervisors.  Assuming that employees comply with the Code of Conduct's reporting rule, the requirement that food safety issues be relayed to a supervisor or the next level of management does not mean that every such issue will landed on the desk of a senior corporate officer.  The Code's mandate most likely relates to the initial reporting of food safety issues.  Thereafter, lower levels of management may resolve many of those issues without involving senior officers.  These allegations provide little help in raising a strong inference of scienter.

The Complaint also alleges that the Individual Defendants acted with scienter to perpetuate Yum!'s rapid growth rate and profitability and, by doing so, maintain their jobs, high compensation levels, and personal reputations.  This allegation, however, is so sweeping that similar motive could be imputed to every corporate officer.  *See Plumber & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012); *PR Diamonds*, 364 F.3d at 690; *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001).  All members of senior management wish to see their corporations prosper and their personal reputations improve.  Furthermore, the prevalence of performance-based compensation packages undermines any meaningful inference of scienter to be drawn from the alleged economic motive.

Finally, the Complaint asserts that the close proximity of Defendants' responses to negative media reports and Su's after-the-fact excuses for not disclosing the failed test results raise a strong inference of scienter.  While Defendants quick responses to critical news stories could suggest deceptive intent, those responses could also be legitimate and routine attempts to preserve Yum!'s public image.  Similarly, the excuses for nondisclosure offered by Su could be interpreted as an admission that he knew of the failed test results during the Class Period, or

those excuses could be construed as an attempt to explain away poor monitoring and oversight. Given the contrasting inferences to be drawn from those allegations, they cannot alone serve as the basis for a strong inference of scienter.

Taken collectively, the Complaint's factual allegations against the Individual Defendants do not raise an inference of fraudulent intent or recklessness that is at least as compelling as the inference of non-fraudulent intent. The inference that the Individual Defendants lacked both knowledge of and an obligation to discover the suppliers' failed test results overwhelms the contrary inference that the results were intentionally or recklessly concealed to deceive the public. Even if the Individual Defendants knew of the negative test results, the Complaint fails to adequately allege that, by not disclosing the results, they consciously disregarded the risk that their statements would mislead investors. Those statements consisted of warnings and commonplace assertions of quality. When making such general statements, a reasonable corporate officer in similar circumstances would be unlikely to recognize any risk posed by the nondisclosure of specific test results. Therefore, the Court concludes that the Complaint fails to sufficiently plead a strong inference of scienter with respect to the Individual Defendants.

### ii.    Corporate Scienter

In *Omnicare*, the Sixth Circuit recently clarified the rule for attributing scienter to a corporate entity.[14] 769 F.3d at 476. The *Omnicare* court adopted the following formulation of the rule:

---

[14] The parties did not have an opportunity to submit written arguments based on *Omnicare*'s refined rule for corporate scienter, but additional briefing is not needed to resolve this motion. The *Omnicare* rule is consistent with prior precedent, including *City of Monroe*, 399 F.3d at 651. *Omnicare*, 769 F.3d at 476–77. While *City of Monroe* contains dicta that could be interpreted to expand the sources from which scienter may be attributed to a corporation, the actual holding relied on the knowledge of a senior corporate officer. *See City of Monroe*, 399 F.3d at 688. That holding is in line with *Omnicare*'s clarification of the corporate scienter rule. *Omnicare*, 769 F.3d at 476–77. Therefore, the corporate scienter rule, as applied in either *City of Monroe* or *Omnicare*, produces the same result in this case.

> The state(s) of mind of any of the following are probative for purposes of determining whether a misrepresentation made by a corporation was made by it with the requisite scienter under Section 10(b): . . .
>
>     a.    The individual agent who uttered or issued the misrepresentation;
>
>     b.    Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance;
>
>     c.    Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance . . . .

*Id.* (quoting Patricia S. Abril & Ann Morales Olazábal, *The Locus of Corporate Scienter*, 2006 Colum. Bus. L. Rev. 81, 135). This formulation cuts back on the broad dicta of *City of Monroe*, which stated that the "knowledge or a corporate officer or agent acting within the scope of [his] authority is attributable to the corporation." 399 F.3d at 688 (quoting 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.8[4], at 444 (4th ed. 2002)) (internal quotation marks omitted); *Omnicare*, 769 F.3d at 476–77.

    The Court previously concluded that the facts alleged do not support a strong inference that the Individual Defendants knew or should have known of the failed test results and the risk of misleading investors by misrepresenting or omitting those results. Therefore, to plead scienter attributable to Yum!, the Complaint must allege that additional agents, falling within the *Omnicare* categories, acted with knowledge or recklessness concerning the failed test results and their nondisclosure. The facts alleged clearly show that, throughout 2010 and 2011, unidentified agents received notice of the suppliers' failed test results. The facts further demonstrate that, during the Class Period, unidentified agents prepared and issued public statements related to food safety risks and the quality of Yum!'s food safety program. However, the Complaint does not contain factual allegations that permit the Court to infer a connection between those two groups of unidentified agents. The inference that Yum!'s high managerial agents and other agents

related to the preparation and issuance of public statements—as noted in the *Omnicare* categories—lacked knowledge of and an obligation to discover the failed test results overpowers the inference that these agents, at minimum, consciously disregarded the risk that their statements would mislead investors.  Accordingly, the Complaint fails to plead a strong inference of Yum!'s corporate scienter.

The Court concludes that the Complaint's factual allegations do not raise a strong inference of scienter with respect to any Defendant.  For this additional reason, the Complaint's allegations of securities fraud are insufficient, and Counts I and II will be dismissed for failure to state a claim.

### B.     Controlling Person Liability

In Count III, the Complaint alleges that the Individual Defendants are liable as controlling persons under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).  (Compl., DN 72, Ct. III.)  Section 20(a) provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the [SEC] in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  A § 20(a) claim must be predicated on at least one underlying violation of securities law by a controlled person, which would be Yum! in this case.  *Frank II*, 646 F.3d at 962.  As discussed above, the Complaint fails to plead a material misrepresentation or omission and a strong inference of scienter attributable to Yum!.  That failure eliminates the claim for securities fraud against Yum!—the only potential underlying claim in this litigation.  Absent a

sufficiently pleaded underlying violation, the § 20(a) claim cannot survive.  Therefore, the

Complaint fails to state a claim for controlling person liability against the Individual Defendants.

## IV.    CONCLUSION

For the reasons stated above, the Court will grant Defendants' Motion to Dismiss

(DN 82).  A separate order and judgment will be entered this date in accordance with this

Memorandum Opinion dismissing Counts I, II, and III of the Complaint (DN 72) with prejudice.


December 23, 2014

**Charles R. Simpson III, Senior Judge**
**United States District Court**


cc:
Counsel of Record
Arun Bondali, *pro se*
William A. Shader, *pro se*
Jason Yun, *pro se*